IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAMES A. SHIPP,                      )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        CIVIL ACTION NO.  2:04CV516-T
                                     )
INTERNATIONAL PAPER COMPANY,         )
                                     )
            Defendant.               )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff James A. Shipp, proceeding *pro se*, brings this action against International Paper Company ("IP") pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*   Shipp asserts (1) a claim for increased pension benefits; (2) a claim for payment due to defendant's failure to provide requested information; and (3) a claim for breach of fiduciary duty.  This action is presently before the court on the motion for summary judgment filed by defendant on October 5, 2004 (Doc. # 13).  Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

## BACKGROUND[1]

Plaintiff began his employment with Union Camp Corporation on February 1, 1967. In July 1994, plaintiff qualified for long-term disability benefits. At that time, he was a salaried employee of Union Camp. On April 30, 1999, defendant International Paper acquired Union Camp. Plaintiff continued to receive long-term disability benefits until he retired effective November 1, 2003,[2] when he reached the age of 65. (Florio aff., ¶¶ 6-10, 23; Exhibit 3 to Florio aff.). As a Union Camp employee, plaintiff was a participant in the Retirement Plan for Salaried Employees of Union Camp Corporation. After IP acquired Union Camp, the Union Camp retirement plan was merged into the IP retirement plan, and plaintiff became a participant in the IP plan. ( Florio aff., ¶¶ 11, 14, 15; Exhibits 1 and 2 to Florio aff.).

After the plans were merged, the retirement benefit for a former Union Camp employee for service prior to January 1, 2000 was calculated as follows:

The Participant's Normal Retirement Benefit shall be an annual amount equal

---

[1] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not raised to the use or admissibility of the evidence to be waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

[2] This was plaintiff's "Normal Retirement Date" as defined by the IP retirement plan. (Florio aff., ¶ 21; Plan 0005, 0017).

to the greater of (a), (b) or (c) as follows:

(a) the sum of (i) and (ii) multiplied by (iii) as follows:

      (i)     1.05% of Final Average Compensation not in excess of Covered Compensation[3]; plus

      (ii)    1.5% of Final Average Compensation in excess of Covered Compensation; multiplied by

      (iii)   Years of Credited Service before January 1, 2000.

(b) 1.1% of Final Average Compensation times Years of Credited Service before January 1, 2000.

(c) the Accrued Benefit as of December 31, 1999 under the Prior Plan.

(Plan 0128-0129; see also Florio aff., ¶ 20 and Exhibits 1 and 2 to Florio aff., Plan 0017-0018 and Plan 0249).    For service beginning January 1, 2000, the retirement benefit was calculated according to the following formula:

1.67% of [the participant's] final average earnings times credited service on and after on and after January 1, 2000 . . .

minus

---

[3] The Plan defines "Covered compensation" as "the average (without indexing) of the taxable wage bases in effect for each calendar year during the 35-year period ending with the calendar year in which the Participant terminates or retires.  A Participants' Covered Compensation shall be automatically adjusted for each Plan Year, as the taxable wage base changes." (Plan 0036).  The Union Camp appendix to the IP retirement plan summary refers to this figure as the "Social Security Average Wage Base" and states that it is "the average of the Social Security maximum taxable wage bases for the 35-year period ending in the year you terminate employment or retire.  The average will be adjusted each year as the Social Security wage base changes." (Plan 0017).

(1.67% of [the participant's] primary Social Security benefit times credited service projected to age 65) times the ratio of credited service at termination of employment over credited service projected to age 65[.]

(Plan 0006, 0018; Florio aff., ¶ 21).[4]   The IP Plan provides that, for employees receiving long-term disability benefits, "credited service continue[s] to accrue under the Plan as long as [the participant] qualif[ies] for long-term disability. (Plan 0005).

IP calculated plaintiff's annual pension benefit to be $35,622.48 and his Single Life Annuity monthly pension benefit to be $2,968.54, based on 36.75 years of credited service, a Social Security average wage base of $24,312, and Final Average Earnings of $71,914.70. (Florio aff., ¶¶ 29-30 and Exhibit 3 to Florio aff.).   Plaintiff's retirement pension benefit was calculated using only the formula set forth in Benefit Schedule C-18 for former Union Camp employees for service prior to January 1, 2000.   (Plan 0128-0130; Florio aff., ¶¶ 20-23 and Exhibit 3).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the

---

[4]   In his affidavit, Florio substitutes the words "the years the participant 'actually work[s]' for International Paper'" for the words "credited service" used in the formula set forth in the Summary Plan Description.   (Compare Florio aff., ¶ 20 with formulas at Plan 0006 and 0018).   In doing so, Florio relies on the statement in the SPD that "Credited service includes all the time you actually work for the company . . . ."   (Plan 0004).   However, the SPD further states that "If you are receiving benefits under a company-sponsored, separate, long-term disability plan, both vesting service and credited service continue to accrue under the Plan as long as you qualify for long-term disability."   (Plan 0005).   Thus, Florio's recitation of the formula is inaccurate.

court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). For issues on which the non-movant bears the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ] – that is, point[ ] out to the district court – that there is an absence of evidence to support the non-moving party's case." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)(quoting U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991)(*en banc*)).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials

listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment."  Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

**DISCUSSION**

**Plaintiff's Claims**

Plaintiff claims that the amount of his monthly pension payment, as calculated by defendant, is incorrect because: (1) the purchase of Union Camp by defendant created confusion regarding which plan applies; (2) the plan administrator used the incorrect benefit formula; (3) plaintiff's "compensation, bonuses and wages as defined in the Summary Plan Description" were not all included in calculating plaintiff's pension benefit; and (4) defendant made mathematical errors in computing plaintiff's benefit. (Complaint, p. 1).

Plaintiff also claims that he is entitled to damages because of defendant's failure to respond to a request for information that he sent to the plan administrator on November 6, 2003. (Id., pp. 1-2).[5]  He further claims that he was misled regarding severance/retirement

---

[5]  The court has had some difficulty in determining the precise nature of plaintiff's claims. Plaintiff has, in his response to summary judgment, underlined certain portions of attached documents and added cryptic notes in the margins.  In many cases, the court has been unable to discern what point the plaintiff was attempting to make and how it related to his claims.  For example, in his response to summary judgment, plaintiff has filed documents apparently relating to a life insurance benefit.  Plaintiff made a claim for this benefit to the administrator.  However, the complaint filed in the present action, even construed liberally, may not fairly be read to include a claim for this life insurance benefit.  See Complaint. To the extent that any of plaintiff's arguments or marginal notes in his response to summary judgment are intended to raise additional claims, the court declines to consider them.  Although plaintiff's complaint must be construed liberally, the court cannot consider claims not fairly presented within the complaint or the attachments to the complaint.  The defendants, in preparing their motion for summary judgment, were entitled to rely

7

benefits by an inaccurate estimate provided by defendant in 2000.

<u>The Claim for Pension Benefits</u>

*Standard for Review of Administrator's Benefit Decision*

A claim for denial of ERISA plan benefits challenging an administrator's interpretation of the plan is reviewed *de novo*, where the plan administrator is not afforded "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  Where the plan does give the administrator discretionary authority, the standard for reviewing the administrator's interpretation is whether it was arbitrary and capricious.  <u>Maracek v. BellSouth Telecommunications, Inc.</u>, 49 F.3d 702, 705 (11th Cir. 1995).  Where the administrator has discretion, but is operating under a substantial conflict of interest, the decision is subject to a "heightened arbitrary and capricious" standard of review.  <u>Id.</u>; <u>Brown v. Blue Cross & Blue Shield of Alabama</u>, 898 F.2d 1556, 1564 (11th Cir. 1990); <u>Vann v. National Rural Electric Cooperative Assoc. Retirement and Security Program</u>, 978 F.Supp. 1025, 1032 (M.D. Ala. 1997).

The Eleventh Circuit has established the following approach for judicial review of ERISA benefit denials, including those based on factual determinations as well as plan

on the claims set forth in plaintiff's complaint and its attachments.

interpretations:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004)(emphasis in original)(footnotes omitted).

*The Applicable Standard*

Plaintiff was a participant in the Union Camp retirement plan and, after Union Camp was acquired by IP, the IP retirement plan. (Florio aff., ¶¶ 11, 15). The Union Camp plan summary provided that "[t]he administration and interpretation of the Plans and the final

and conclusive decisions on such matters as coverage, eligibility, and payment of benefits are the sole and exclusive responsibility of [Union Camp] and its contractual agents." (Id., ¶¶ 12; Plan 0264; see also Plan 0201-0202). The IP Plan Summary states, "The Plan provides that the plan administrator has authority and discretion to interpret the Plan and to determine all disputes under the Plan and that the plan administrator's decision shall be final, conclusive and binding on the Plan, the company, the participant and any other person claiming an interest in the Plan." (Florio aff., ¶ 16; Plan 0012; see also Plan 0075-0076 (stating that the administrator has "discretionary power and discretionary authority . . . to interpret the Plan, and to resolve ambiguities, inconsistencies and omissions, which determination shall be conclusive and binding upon all persons having any interest in or under the Plan [and] . . . to determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan . . . .")).    The Union Camp retirement plan was funded by a separate trust to which Union Camp did not have access for any purpose other than funding and administering claims for benefits under the plan. (Florio aff., ¶ 13; Plan 0195). When the Union Camp plan was merged into the IP retirement plan, the Union Camp retirement plan trust assets were transferred to the IP retirement plan trust. (Florio aff., ¶ 18). IP does not have access to that trust for any purpose other than funding and administering claims for plan benefits. (Id., ¶ 17; Plan 0069).

In the present case, the plan expressly grants the administrator discretionary authority to interpret its terms and to determine benefits payable under the plan, and there is no substantial conflict of interest.[6]  Thus, should the court reach the conclusion that the benefit determination was incorrect, the administrator's interpretation of the plan or factual determinations will be subject to the "arbitrary and capricious" standard of review.

*The Applicable Plan*

The first part of plaintiff's benefit claim – that there was confusion over which plan applied – is immaterial in view of the evidence and arguments of the parties on the present motion.  The parties agree that, after defendant purchased Union Camp, the Union Camp plan merged into the IP plan, and plaintiff became a participant in the IP plan.  (Florio aff., ¶¶ 11, 14, 15; Plaintiff's response (Doc. # 19, second page following certificate of service, ¶¶ 8-9); see also ¶ 34 ("I maintain that the IP retirement package should apply to me.  It's the only plan left.")).  Thus, the dispute between the parties does not concern which of the

_____

[6]  In Adams v. Thiokol Corporation, 231 F.3d 837, 843 (11th Cir. 2000), the court found a conflict of interest requiring heightened scrutiny where the plan administrator was a Thiokol employee and the plan provided for payment of benefits from the general assets of the corporation. In the present case, Florio is employed by defendant as its Director of Employee Benefits. (Florio supplemental affidavit, ¶ 2).  However, because defendant funds its plan through a trust to which it does not have access except for the purpose of paying benefits, Florio's status as defendant's employee does not establish a substantial conflict of interest.  See Turner v. Delta Family-Care Disability and Survivorship Plan, 291 F.3d 1270, 1273 (11th Cir. 2002)(finding no conflict of interest where plan administrator was committee consisting of defendant employer's employees, and benefits were paid from a trust funded by the employer through irrevocable period contributions).

two plans is applicable.  Rather, the issue is whether the administrator properly applied the appropriate benefit formula within the IP plan to calculate plaintiff's pension benefit.

*The Applicable Benefit Formula*

Defendant argues that plaintiff is claiming that the IP retirement plan formula of 1.67% should be applied to all of his years of credited service to calculate his pension benefit, and explains why it believes that plaintiff is incorrect.  (Doc. # 14, pp. 11, 13-15; Doc. # 20, pp. 2-3).   However, while plaintiff asserted this claim during the administrative process, he has not done so in this action.  Nowhere in the complaint or in his response to summary judgment does plaintiff state that he was entitled to have the 1.67% formula applied to all of his years of credited service. Instead, plaintiff appears to assert in his complaint that the benefit schedule set forth in Schedule C-18 of the IP plan is applicable. (See note on p. 22 of Union Camp Plan attached to complaint)("IP cancelled this plan and re-issued a new plan - see SPD sch. C-18").[7]  The benefit formula set forth in this schedule, which applies to former Union Camp employees, by its express terms applies only to credited service before January 1, 2000 and does not include the 1.67% formula.  The

_____

[7]  See also Doc. # 19, Plaintiff's response to motion for summary judgment, ¶ 15 following certificate of service ("I agree that for service after January 1, 2000 the standard IP formula was in force, as the Union Camp retirement plan had merged and terminated, and was the greater of the two (2) plans."; Id., ¶ 14 (plaintiff does not disagree with defendant's statement of the benefit formula applicable for service prior to January 1, 2000).

schedule states, "This Benefit Schedule C-18 describes benefits provided for service prior to January 1, 2000. Effective January 1, 2000, Eligible Employees covered by this Benefit Schedule C-18 became covered under the provisions of Benefit Schedule C." (Plan 0128, Predecessor Employer). It further states that "[f]or purposes of this Benefit Schedule C-18, Credited Service shall only include service prior to January 1, 2000." (Id., ¶ 3.03). Benefit Schedule C is the part of the plan which includes the 1.67% formula. (See Plan 0275; attached to Doc. # 22).

On another document attached to his complaint (p. 18, UCC Plan), plaintiff has bracketed the benefit formula of the Union Camp plan – which is the same as that set forth in Benefit Schedule C-18 (see Florio supplemental affidavit, ¶ 6) – and annotated it with the note, "Formula for years of service with Union Camp Corp." At the bottom of the page, he states, "According to the SPD [summary plan description], I'm to receive the greater of pension plans." The IP summary plan description which explains the terms of the plan effective January 1, 2000 includes an appendix applicable to employees who were "covered by the Retirement Plan for Salaried Employees of Union Camp Corporation (the Prior Plan) on December 31, 1999." (Plan 0017). The appendix describes a two-part benefit formula. The first part – for service before January 1, 2000 – is the same as Benefit Schedule C-18. (Id.). The second part of the formula – for service beginning January 1, 2000 – describes

the 1.67% formula established in Benefit Schedule C.  (Plan 0018).

Thus, although plaintiff has not clearly articulated the basis for his contention that defendant used the wrong benefit formula, plaintiff's claim appears not to be that the 1.67% benefit should apply to all of his years of credited service,[8] but that it should

---

[8] Even if plaintiff had asserted such a claim, he would not be entitled to prevail on the present motion.  The written plan documents in effect at plaintiff's retirement did not include any provision applying the 1.67% retirement calculation to all of the service of former Union Camp employees. In its summary judgment motion, defendant argued that the plan was amended in 2002 to extend this more generous formula to former Union Camp employees who had "actually worked" for IP (as opposed to only for Union Camp) before their retirement.  However, defendant did not provide the court with the plan provisions pertaining to this amendment.  When the court required defendant to do so (see order entered April 17, 2005, Doc. # 21), defendant filed a document signed by Florio on December 23, 2004 – nearly seven months after this action was filed and six weeks after the briefing schedule on the present motion had concluded – purporting to "memorialize" an amendment to the benefit schedule, effective January 1, 2003.  (See Plan 0284-0288).  Thus, it is apparent that until December 23, 2004, there was no language in the plan either extending the 1.67% all service benefit to former Union Camp employees or excluding any such former employees who were on disability and who had not returned to work.  The IP Plan provides that it may be amended by written resolution either by the Board of Directors or the Plan Administrator (see ¶¶ 13.01 and 12.01, Plan 0074-0076, 0079).  Florio was not the plan administrator on January 1, 2003; he did not assume the position until May 11, 2004. (See Florio aff., ¶ 4).  It is questionable whether the Plan gives him the authority to amend the plan effective at a point in time prior to his tenure.  Even if it does, however, ERISA does not permit this retroactive amendment.

In Smith v. National Credit Union Administration Board, 36 F.3d 1077 (11th Cir. 1994), the Eleventh Circuit rejected amendments made orally by the employer's board and confirmed in writing sixteen months later.  The court stated:

ERISA expressly provides that "[e]very employee benefit plan shall be established and maintained pursuant to a *written* instrument." 29 U.S.C. § 1102(a)(1)(emphasis added).  Indeed, pursuant to this section, this Court, in Nachwalter v. Christie, 805 F.2d 956 (11th Cir. 1986), held that ERISA prohibits not only oral modifications, but *informal written* amendments of employee benefit plans as well.

14

apply to his credited service beginning January 1, 2000.

* * * * *

> We find no legally significant distinction between an oral amendment and an oral amendment which is formalized in a writing months or years later and retroactively applied to the time of the oral amendment. Because we find oral amendments impermissible, we likewise conclude that subsequently formalized and retroactively applied oral amendments are impermissible. Here, as in Nachwalter, the central policy goal of ERISA – protecting the interests of employees in employee benefit plans – would be undermined if we were to permit subsequently formalized amendments to take effect as of their oral genesis. In the absence of documents, it would be impossible for plan participants to compare any "notices" of modification they might receive with the amendments themselves; in effect, they would be precluded from determining their rights and obligations at the time of the oral amendments. . . . Accordingly, we hold that any modification or amendment to an ERISA plan can be implemented or applied only *after* the amendment has been appropriately adopted in a formal , complete, and written form.

Id. at 1080-81; see also  Confer v. Custom Engineering Company, 952 F.2d 41 (3rd Cir. 1991)(backdated written amendment ineffective to amend plan retroactively). Indeed, to the extent that defendant has taken action or made increased benefit determinations based on its informal or oral amendment of the plan, other participants potentially  have a cause of action against defendant. Cf. Nachwalter, *supra*, 805 F.2d at 960 ("A central policy goal of ERISA is to protect the interests of employees and their beneficiaries in employee benefit plans. This goal would be undermined if we permitted oral modifications of ERISA plans because employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.")(citations omitted); Cefalu v. B.F. Goodrich Company, 871 F.2d 1290, 1296 (5th Cir. 1989)("[T]he writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to such under the express terms of the plan."). However, the informal amendment provides no relief to plaintiff. Since the written plan did not extend the 1.67% all service benefit to former Union Camp employees, plaintiff has no claim for that benefit. See Liberty Life Assurance Company of Boston v. Kennedy, 358 F.3d 1295 (11th Cir. 2004)("'The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself.'")(citation omitted).

15

Citing Shannon v. Jack Eckerd Corp., 113 F.3d 208 (11th Cir. 1997) and Jett v. Blue Cross & Blue Shield, 890 F.2d 1137 (11th Cir. 1989), defendant argues that the court is required to remand the issue of whether plaintiff was entitled to have the 1.67% formula applied to his credited service on or after January 1, 2000 because plaintiff did not argue during the administrative claims process that he was so entitled.   (Doc. # 22, p. 3).   However, defendant has misstated the holding of Shannon.   Both Shannon and Jett dealt with the issue of new *evidence* presented first before the district court, not new argument. In addition, a claim that plaintiff was entitled to have the 1.67% benefit formula applied to all of his years of credited service necessarily includes a claim that the 1.67% formula should be applied to the last three years of such service.   Defendant's argument is, accordingly, without merit.

Defendant agrees that the first part of the formula set forth in the IP Summary Plan Description Appendix (and in Benefit Schedule C-18) applies to plaintiff.   (See Florio aff., ¶¶ 20, 23 (citing SPD appendix); Florio supplemental aff., ¶ 6; compare formula at Plan 0129, ¶ 4.01 with formula set forth in Florio affidavit as applicable to plaintiff; Doc. # 23, p. 2). Defendant contends, however, that the second part of the formula set forth in the IP Summary Plan Description Appendix applicable to Union Camp employees was not used to calculate plaintiff's benefit for the period between January 1, 2000 and plaintiff's

retirement on November 1, 2003 because plaintiff "did not have any active service on or after January 1, 2000. . . ." (Doc. # 22, p. 3).

In its April 7, 2005 order, the court directed defendant either to file evidence or to point the court to evidence already in the court record of:

> (b) any language within the Plan documents upon which the administrator relied in determining that the term "credited service as used in the Plan summary appendix (Plan 0018) for calculating the "Retirement Benefit for Service Beginning January 1, 2000"[9] does not include "credited service" accrued while an employee is receiving long-term disability benefits (see Plan 005 ("[B]oth vesting service and credited service continue to accrue under the Plan as long as you qualify for long-term disability."));

> (c) any language within the Plan documents upon which the administrator relied in determining that Benefit Schedule C-18 (Plan 128-130) should be used to determine retirement benefits for plaintiff's credited service *on or after* January 1, 2000.

(Doc. # 21, pp. 1-2).  In response to this order, defendant did not direct the court to any language within the Plan documents upon which the administrator relied as set forth in the order.  (See Doc. # 22, pp. 1-3).  Rather, defendant responded that "the Plan's application of the benefit formula from the predecessor plan which was in effect when Mr. Shipp performed his last hour of work, see Benefit Schedule C-18 (Plan 0128-0130), was based on the Plan's consistent past practice." (Doc. # 22, p. 2).  In his supplemental affidavit, Florio states:

---

[9] As noted previously, this is the portion of the benefit formula which applies the 1.67% factor.

As of his Normal Retirement Date, Mr. Shipp was considered an inactive employee because he was receiving long term disability benefits. He had been in this inactive status since July, 1994, when he began receiving long term disability benefits. Because Mr. Shipp did not have any active service on or after January 1, 2000, the IP Retirement Plan did not apply the 1.67% benefit formula to the time period between January 1, 2000, when he became a participant in the IP Retirement Plan, and his November 1, 2003 retirement date. The Plan has consistently applied this procedure to retiring employees who become International Paper employees by acquisition, but who did not provide any active service to International Paper because they were receiving disability benefits at the time of the acquisition and continued to receive disability benefits until their retirement date.

(Florio supplemental aff., ¶ 14).

As previously noted, defendant agrees that benefit schedule C-18 applies to plaintiff. Defendant contends that this schedule applies only to plaintiff's service before January 1, 2000, but does not apply to service on or after that date. However, benefit schedule C-18 expressly limits its application to service prior to January 1, 2000. (Plan 0128)("This Benefit Schedule C-18 describes benefits provided for service prior to January 1, 2000. Effective January 1, 2000, Eligible Employees[10] covered by this Benefit Schedule C-18 became covered under the provisions of Benefit Schedule C."). Benefit Schedule C sets forth the 1.67% formula. (Plan 0275 attached to Doc. # 22). The IP Summary Plan Description appendix applicable to former Union Camp employees includes an example for

---

[10] Defendant has not argued that plaintiff is not an "eligible employee" as used in benefit schedule C-18.

a former Union Camp employee with 14 years of credited service before January 1, 2000 and one year of credited service beginning January 1, 2000. The formula used in the appendix to calculate the benefit applies the schedule C-18 formula to the 14 years of credited service before January 1, 2000 and the 1.67% formula – "1.67% of your final average earnings times credited service on and after January 1, 2000 minus (1.67% of your primary Social Security benefit times credited service projected to age 65) times the ratio of credited service at termination of employment over credited service projected to age 65"[11] – to the one year of credited service beginning January 1, 2000. The summary plan description further states, "If you are receiving benefits under a company-sponsored, separate, long-term disability plan, both vesting service and credited service continue to accrue under the Plan as long as you qualify for long-term disability." (Plan 0005).

The plan unambiguously states that schedule C-18 does not apply to credited service earned by former Union Camp employees on or after January 1, 2000; that benefit schedule C does apply to credited service earned on or after January 1, 2000; and that credited service continues to accrue for employees on long-term disability benefits. The defendant, who bears the burden of proof on the present motion, has not directed the court to any language within the plan supporting the administrator's decision to apply the

---

[11] This formula is the same as the "standard benefit formula" described in the Summary Plan Description. (Plan 0006).

schedule C-18 formula to credited service accruing on or after January 1, 2000, or demonstrating the existence of any ambiguity regarding whether the C-18 schedule applies to credited service accruing on or after January 1, 2000.

Florio's testimony that IP has "consistently applied this procedure [declining to apply the IP standard benefit schedule] to retiring employees who become International Paper employees by acquisition, but who did not provide any active service to International Paper because they were receiving disability benefits at the time of the acquisition and continued to receive disability benefits until their retirement date" does not establish the plan's consistent interpretation of any particular plan language.   Rather, it describes a procedure consistently employed by the plan without reference to any plan language.   In any event, the court has no occasion to consider this extrinsic evidence in view of its conclusion that the express terms of the plan are unambiguous, and they preclude the application of the C-18 benefit schedule to credited service accruing on or after January 1, 2000.   See Epright v. Environmental Resources Management, Inc. Health and Welfare Plan, 81 F.3d 335 (3rd Cir. 1996)("A Plan Administrator has discretion when interpreting the terms of the Plan; however, the interpretation may not controvert the plain language of the document.   Extrinsic evidence may be used to determine an ambiguous term; however, it is inappropriate to consider such evidence when no ambiguity exists.

Additionally, past practice is of no significance where the plan document is clear.")(citations omitted); <u>see also</u> <u>Adams v. Thiokol</u>, 231 F.3d 837, 844 (11th Cir. 2000)(extrinsic evidence may be considered to explain ambiguous language in an ERISA plan); <u>Stewart v. KHD Deutz of America Corp.</u>, 980 F.2d 698, 702 (11th Cir. 1993)(applying federal law to the interpretation of a contract covered by § 301 of the Labor Management Relations Act; stating that extrinsic evidence is not admissible unless the contract terms are ambiguous); <u>Smart v. Gillette Company Long-Term Disability Plan</u>, 70 F.3d 173, 178 (1st Cir. 1995)("In construing the terms of contracts that are governed by federal common law, we are guided by 'common-sense canons of contract interpretation.' One such canon teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning.")(citation omitted).

Based on the plain language of the plan documents, the court concludes that the administrator erred when it declined to apply the 1.67% benefit formula to plaintiff's credited service accrued on or after January 1, 2000. This does not end the court's inquiry, however. Under the arbitrary and capricious standard, an administrator's incorrect decision will nevertheless be upheld if it is supported by reasonable grounds. <u>Williams</u>, <i>supra</i>, 373 F.3d at 1138. As noted above, although defendant has introduced evidence of consistent application of a policy regarding acquired employees on long-term disability,

21

it has not directed the court to any language in the plan documents supporting the policy. If the consistent policy is independent of any plan language, that alone may render the administrator's decision arbitrary and capricious.  See Morgan v. Mullins, 643 F.2d 1320 (8th Cir. 1981)("Where the Trustees impose a standard not required by the pension plan itself, . . . such action 'would result in an unwarranted and arbitrary construction of the Plan.'")(citation omitted).   However, even if defendant had demonstrated that the administrator's consistent application of this policy resulted from his interpretation of the terms of the plan, a construction of the plan consistent with past practice may still be arbitrary and capricious if it conflicts with the unambiguous terms of the plan. See id. at 1324 n. 4 (an interpretation which is unreasonable from the beginning, even if consistently applied, may still be arbitrary and capricious).  "[The court is] guided by the language of the [plan], and any interpretation that contradicts the clear wording of the [plan] has to be arbitrary and capricious."   Harris v. Pullman Standard, Inc., 809 F.2d 1495, 1498 (11th Cir. 1987); Seales v. Amoco Corporation, 82 F. Supp. 2d 1312 (M.D. Ala. 2000)("The court may find that 'application of plan provisions is arbitrary and capricious if it is clearly in conflict with the [P]lan's plain language.'")(citation omitted).

The administrator's decision not to apply the 1.67% benefit formula to plaintiff's credited service accrued on or after January 1, 2000 conflicts with the unambiguous

language of the plan.   Therefore, it was not supported by a reasonable basis and was arbitrary and capricious.   Accordingly, defendant is not entitled to summary judgment on plaintiff's claim for increased pension benefits to the extent that claim is based on defendant's resort to the wrong benefit formula.

*Use of Income as Reported on W-2s*

IP calculated plaintiff's "Final Average Compensation" for purposes of the benefit schedule formula to be $71,914.70. (Florio aff., ¶ 29 and Exhibit 3 to Florio aff.).  This figure was calculated using a "pensionable pay history" as follows: 1989 ($30,205.50 - six months), 1990 ($65,416.00), 1991 ($70, 503.00), 1992 ($72, 395.00), 1993 ($72, 695.00), and 1994 ($48, 359.00 - six months).  (Exhibit 3 to Florio aff.).  During the administrative process prior to his retirement, plaintiff contended that his final average earnings should have been calculated using his income as reported on his W-2 forms, which reflected the following: 1989 ($61,102.45 - 12 months), 1990 ($67,865.07), 1991 ($72,675.46), 1992 ($73,206.52), 1993 ($73,581.58), 1994 ($49,014.59) . (See Shipp 0055-0062).  Along with correspondence to the plan administrator dated December 5, 2003 and December 6, 2003, plaintiff included a detailed earnings report from the Social Security Administration reflecting total compensation of $67,865.07 for 1990 and an "OASDI yearly total" of $49,868.37 for 1994, which plaintiff argued should have been used to calculate his pension benefit.  (Shipp 0107

to 0111).   The earnings report did not include information for years other than 1990 and 1994.[12]

Plaintiff argues that the income reported on his W-2s – which is slightly higher than the figures used by defendant – should have been used to calculate his final average compensation because the terms of the plan require the administrator to use plaintiff's actual salary history, as evidenced by documentation from the Social Security Administration.   (See plaintiff's response to summary judgment, paragraphs numbered 19-22 following certificate of service).   In support of this contention, plaintiff relies on paragraph 1.485 of the IP Plan.   (See Plan 0043, also appended to plaintiff's summary judgment response marked as Exhibit zz SH-2).   This paragraph states:

_____

[12]  In his response to the present motion, plaintiff asks the court to consider a letter from Roy S. Bradford of the Social Security Administration and an attached earnings summary for the years 1990 through 1994.  The letter is not an affidavit.   Apparently recognizing this, plaintiff explains that "[t]he Social Security Admin. has no notary public on staff nor other legal employees.  The court has full [subpoena] power over Social Security employees, and I was informed that they would be compliant if necessary." (Plaintiff's response, p. 1).  Defendant objects to the letter as hearsay. (Reply brief, p. 4).  Plaintiff has twice previously been advised of the requirements for responding to a motion for summary judgment including, specifically, the need to use sworn affidavits or other evidence authorized by Rule 56(e). (See Docs. ## 16, 18).  Plaintiff's explanation in his brief that the Social Security Administration has no notary public is insufficient to justify relief under Fed. R. Civ. P. 56(f).  The letter and its attachments are due to be excluded as inadmissible hearsay, and the court has not considered them in resolving the present motion.  Even if it had considered these documents, however, the letter and attachments would not change the court's conclusion that the administrator's decision not to use Social Security or W-2s to calculate plaintiff's "final average earnings" was not arbitrary and capricious.

24

1.485 - <u>Right to Use Actual Salary History</u>.  In lieu of using such imputed prior salary history, the Participant shall have the right to have his actual salary history used by providing to the Company the appropriate documentation from the Social Security Administration.  Such documentation must be provided to the Company within 180 days after the later of (a) the Participant's Separation from Service by retirement or otherwise, or (b) the time when the Participant is notified of the retirement benefit to which he is entitled.   The Company shall take appropriate measures to notify Participants of this provision.

(Plan 0043).   This subparagraph, however, falls within a section of the plan defining "Primary Social Security Benefit."  (IP Plan § 1.48, Plan 0042).[13]  It does not pertain to the

---

[13]  This section provides:

1.48 "<u>Primary Social Security Benefit</u>" means, unless otherwise specified in an applicable benefit schedule:

1.481 - <u>General</u>. "Primary Social Security Benefit" means the annual primary insurance benefit (as estimated by the Company as of the "determination date") to which a Participant would be entitled, beginning at his Normal Retirement Date, under Title II of the Social Security Act as it is in effect on the earlier of (a) the later of his Normal Retirement Date or his Postponed Retirement Date, or (b) the date his employment with the Company or Affiliated Company is terminated.

1.482 - <u>Postponed Retirement</u>. If a Participants' termination of employment with the Company is subsequent to his Normal Retirement Date, such benefit shall reflect Compensation received after his Normal Retirement Date but shall not include any adjustment to the primary insurance amount given under the Social Security Act for delayed retirement.

1.483 - <u>Future Compensation</u>. The Company's estimate will assume that the Participant will continue to receive wages until his attainment of Age 65 (assuming no increase in his wages), and that he would qualify for Social Security benefits beginning at his Normal Retirement Date, even though he may qualify at an

25

"Final Average Earnings" or "Final Average Compensation" as used in the IP benefit

_____

earlier or later date.

1.484 - <u>Prior Compensation</u>. Except as provided in Section 1.485, prior salary history shall be determined by applying wage discounts to the Participant's earliest known wages with the Company according to historical changes in the "Average Per Worker Wage" statistics reported by the Social Security Administration.

1.485 - <u>Right to Use Actual Salary History</u>. In lieu of using such imputed prior salary history, the Participant shall have the right to have his actual salary history used by providing to the Company the appropriate documentation from the Social Security Administration. Such documentation must be provided to the Company within 180 days after the later of (a) the Participant's Separation from Service by retirement or otherwise, or (b) the time when the Participant is notified of the retirement benefit to which he is entitled. The Company shall take appropriate measures to notify Participants of this provision.

1.486 - <u>Determination Date</u>. For purposes of this section, the determination date shall be:

With respect to a Participant who becomes a non-salaried Employee while remaining in the employ of the Company or Affiliated Company, the date of such transfer to non-salaried status.

With respect to all other Participants, the Employee's Severance From Service Date.

1.487 - <u>Not for Use in Level Income Option</u>. This section does not apply to the determination of the Social Security Benefit to be used in the determination of the level income Actuarial Equivalent optional forms of payment in Section 8.04.

(Plan 0042-0043).

schedules.   The plaintiff has directed the court to no language in the plan requiring the administrator to use documentation from the Social Security Administration to compute a participant's final average earnings.   Thus, the court concludes that there is no evidence demonstrating the existence of a genuine issue of material fact regarding whether defendant   erred in refusing to calculate this figure using the W-2 documentation provided by plaintiff.

The court has insufficient evidence before it to determine whether the final average earnings calculated by defendant are accurate – *i.e.*, consistent with the Plan's definition of "compensation" as set forth in ¶ 1.14 of the Plan.   However, even if the compensation figures used by the Plan to calculate final average earnings are wrong,[14] there is no genuine issue of fact regarding whether the Plan's use of those compensation figures was arbitrary and capricious.   In calculating plaintiff's final average earnings, defendant used payroll information provided to it by Union Camp.   (Florio aff., ¶ 45 and Exhibits 10-11 to Florio aff.; Shipp 0068-0069).   The administrator was vested with discretion in making benefit determinations, and reasonable grounds – the salary information provided by Union Camp – supported the decision.   Thus, this aspect of the administrator's decision regarding plaintiff's pension benefit was not arbitrary and capricious.   See Turner v. Delta Family-

---

[14] This particular issue – whether the correct figures were used – relates to a factual determination by the administrator, not to an issue of plan interpretation.

Care Disability and Survivorship Plan, 291 F.2d 1270 (11th Cir. 2002)(administrator's factual determination regarding plaintiff's disability was supported by medical evidence and was not arbitrary and capricious).

<em>Social Security Average Wage Base</em>

Plaintiff challenges the administrator's decision not to use the Social Security Average Wage Index for 1994[15] in calculating his pension benefit. (See National Average Wage Index attached to complaint).  The National Average Wage Index for any given year is the average of the total wages for that particular calendar year.  See 42 U.S.C. § 409(k)(1). The benefit schedule formula uses the "Social Security Average Wage Base," which is defined in the Summary Plan Description appendix as "the average of the maximum taxable wage bases for the 35-year period ending in the year you terminate employment or retire." (Plan 0017).  The appendix further states that "[t]he average will be adjusted each year as the Social Security wage base changes."  (Id.; see also Florio aff., ¶ 24).  Thus, the national average wage index for 1994 and the "Social Security Average Wage Base" for 1994, as

---

[15]  The parties agree that the pension benefit calculation for plaintiff should use the Social Security Average Wage Base for the year 1994. When a retiring participant is on long-term disability benefits, the Social Security average wage base used to calculate pension benefits is the one in effect on the day the participant was removed from the active payroll. (Florio aff., ¶ 28 and Exhibit 1 to Florio aff., p. 137).   The dispute is whether the "National Average Wage Index" calculated by the Social Security Administration and the "Social Security Average Wage Base" as used in the benefit schedule are the same.

defined by the terms of the plan, are clearly not the same.   Accordingly, the plan administrator's decision not to use the national average wage index was correct, and plaintiff is not entitled to relief on this basis.

*Mathematical Calculation Error*

Plaintiff argues that defendant incorrectly calculated the actuarial equivalence factor to be used to determine plaintiff's monthly pension benefit with a 100% Joint and Survivor annuity option.   (See IP Plan, ¶ Plan 0059-60).   Plaintiff contends that the correct factor is 0.811.   (Doc. # 19, p. 2).   The factor used by the administrator in calculating plaintiff's monthly pension benefit was 0.774.   (Exhibit 3 to Florio affidavit, p. 2).   The formula for calculating the factor for the 100% Joint and Survivor option is: $0.810 - 0.006 (X - Y) + 0.007 (65-X)$, where X represents the employee's age at retirement and Y represents the beneficiary's age.   (Plan 0222).   According to the dates of birth plaintiff lists for himself and for his wife (see plaintiff's notes on copy of Plan 0222 attached to plaintiff's response to motion for summary judgment), on the date of plaintiff's retirement (November 1, 2003) plaintiff was 65 years of age and his spouse was 59.   Applying the formula above results in an actuarial equivalence factor of 0.774, the factor calculated by the administrator.   To the extent plaintiff contends that the administrator should have used an exact age for his spouse (*i.e.*, 59.5 years) instead of her age in whole years (see plaintiff's notes on Plan

0222), the court concludes that the administrator's interpretation of the actuarial equivalence factor formula to require the use of age in whole years is a reasonable interpretation of the terms of the plan.[16] Thus, plaintiff is not entitled to relief on the basis of the alleged mathematical computation error.[17]

<u>Failure to Provide Requested Information</u>

Plaintiff brings a claim pursuant either to 29 U.S.C. § 1133(1) or § 1132(c) seeking "payment" for the administrator's refusal to answer his request for information. Plaintiff alleges:

> I requested from the Plan Admin. an explanation on 11/6/2003 as to <u>why</u> my W-2 earnings were not recognized the compensible [sic] earnings and what earnings were excluded. To date 5/29/04, I have not received an answer or explanation.

(Complaint, ¶ 2). The request to which plaintiff refers was actually sent on December 6, 2003, not November 6, and was received by the administrator on December 10, 2003. (Shipp 110-11).[18] Plaintiff's request is addressed to the plan administrator (then Carter), and it states, in part:

---

[16] Using 59.5 years for the age of plaintiff's spouse results in an actuarial equivalence factor of 0.777, not 0.811, the factor claimed by plaintiff to be accurate. Plaintiff has himself previously calculated this factor to be 0.795 (<u>see</u> documents attached to Doc. # 10).

[17] Because of this conclusion, the court does not address defendant's exhaustion argument.

[18] <u>See also</u> December 5, 2003 request (Shipp 0107-08).

30

> Please send me the actual earnings statements used to calculate my pension benefits. Enclosed are copies of 1990 and 1994 which were provided by the Social Security Administration, and disclose wages, tips, bonuses. It (they) does <u>not</u> include any <u>exclusions</u>. If these documents weren't used (and they weren't), please provide the ones that were and a detailed explanation as why.

(Shipp 110). On January 9, 2004, Melissa Hartfiel from the administrator's office sent a letter to plaintiff responding to his request for information. (Shipp 0113-17). The letter states, in part:

> Our records indicate that a calculation detail was mailed to you previously explaining the earnings used in the calculation. We are enclosing another copy of that calculation. According to our records the correct earnings, as supplied by Union Camp Corporation, were used in your pension calculation. It is important to understand that Social Security earnings and pensionable earnings usual [sic] differ since certain earning components are not considered pensionable.

(<u>Id</u>.). Hartfiel's letter advises plaintiff that the earnings figures used in the calculation were those provided by Union Camp. Plaintiff was previously aware of the figures supplied by Union Camp. (<u>Compare</u> Shipp 0045-46 and Shipp 0080; <u>see also</u> Florio aff., ¶ 45 and Exhibits 10 to Florio aff.).[19] It is undisputed that the administrator responded to plaintiff's request and provided him with the earnings information upon which the administrator relied in calculating his pension benefit. Whether the figures are actually correct is

_____

[19] The initial figures provided by Union Camp for 1989 and 1994 were subsequently adjusted to reflect earnings for six months in each of those years, at plaintiff's request. (<u>See</u> Shipp 0062, attachment 10 to Florio aff.; Doc. # 19, ¶ 39 following certificate of service).

immaterial to plaintiff's claim that the administrator failed to provide requested information.

Accordingly, defendant is entitled to summary judgment on this claim.

### Breach of Fiduciary Duty

In his complaint, plaintiff alleges that:

> Int. Paper est. in 2000 "duped" me. I was as elgible [sic] as others that opted for severance (buy out), ret. – I was 62 The pkg. given was 1-1½ yrs severance plus full retirement.

(Complaint, p. 4, ¶ H).[20]   A claim that a plan participant was misled to his detriment by incorrect information provided by a plan fiduciary is one for breach of fiduciary duty.[21] Defendant has not addressed this claim in any fashion in its motion for summary judgment and, thus, has not demonstrated its entitlement to summary judgment on the claim.

### CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion for summary judgment (Doc. # 13) be DENIED as to plaintiff's

---

[20] In documents attached to his response to the summary judgment motion, plaintiff states that, as a result of the incorrect estimate of pension benefits provided to him by IP in December 2000, he lost "approx[i]mately $44,000." (See Doc. # 19, 1st page following *second* certificate of service and captioned "IP Retirement Plan").

[21] See *e.g.*, Daniels v. Thomas & Betts Corporation, 263 F.3d 66, 75-76 (3rd Cir. 2001)("[I]f an employee proves that an employer, acting as a fiduciary, made an inaccurate statement holding a substantial likelihood of misleading a reasonable employee into making a harmful decision regarding benefits, and that he relied to his detriment on that statement in making such a decision, the employee is entitled to equitable relief.").

claim that his pension benefit was calculated by resort to an incorrect benefit formula for his credited service accruing on or after January 1, 2000 and as to his breach of fiduciary duty claim, and that the motion be GRANTED in all other respects.

The Clerk of the Court is ORDERED to file the Recommendation of the Magistrate Judge and to serve a copy on the parties to this action.  The parties are DIRECTED to file any objections to the said Recommendation on or before September 19, 2005.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the recommendation and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Resolution Trust Co. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993);  Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, this 6th day of September, 2005.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE